IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| V3 WORLD MANAGEMENT,<br><br>                            Plaintiff,<br><br>v.<br><br>SYNERGY WORLDWIDE,<br><br>                            Defendant. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 2:16-cv-323<br><br>District Judge Dee Benson |

Before the Court are two motions:  Plaintiff V3 World Management's ("V3") Motion for a Preliminary Injunction (Dkt. No. 7) and Defendant Synergy Worldwide's ("Synergy") Motion to Dismiss (Dkt. No. 18).  On September 27, 2016, the Court heard oral argument on the motions.  At the conclusion of the hearing, the Court took the motions under advisement.  Now being fully advised, the Court renders the following Memorandum Decision and Order.

## BACKGROUND

The Second Amended Complaint involves a contract dispute between Synergy and V3. Synergy is a Utah corporation that operates a multi-level marketing business for nutritional supplements.  (Dkt. No. 16, ¶¶ 4, 7.)  V3 is a New Hampshire corporation owned by Bernard Feldman ("Feldman").  (*Id.* at ¶ 3.)  Feldman is also the owner of HealthBanc International, LLC ("HealthBanc").

In 2011, Synergy permitted V3 to purchase a Synergy distributorship with a "very profitable downline and approximately $148 million of banked volume."  (*Id.* at ¶ 12.)  V3 entered into a distributor agreement with Synergy that permitted V3 to become a "team member,

1

. . . to sell Synergy's products, and . . . to build a profitable downline of other sellers whose sales would result in commissions to V3." (*Id.* at ¶ 13.)

In 2006, HeathBanc negotiated and entered into a license agreement with Synergy in order to allow Synergy to market one of HealthBanc's nutritional supplements. (Dkt. No. 11, ¶ 2.)

V3 alleges that Synergy made several representations to its potential team members regarding the profitability of a Synergy distributorship. For example, Synergy stated that Synergy "enables [a team member] to earn a residual income based on retail profits, lucrative bonuses and basic commissions stemming from the sale of Synergy products." (Dkt. No. 16, ¶ 11a.) Similarly, a Synergy team member can build "a long-term business opportunity that's lucrative, aggressive, and rewarding." (*Id.* at ¶ 11f.) However, Synergy's distributorship agreement expressly states that "[a] Team Member is neither guaranteed a specific income nor assured any level of sales, profit, or success." (Dkt. No. 7-1, § 7.1.)

Additionally, Synergy's distributorship agreement states: "A Team Member must comply with the Synergy Code of Ethics, these Policies and Procedures, the Membership Application, the Compensation Plan, all contractual obligations, and state, federal and other applicable U.S. and foreign laws." (Dkt. No. 7-1, § 4.1.) Furthermore, Synergy "reserves the right to conduct investigations on Team Members and their activities to ensure compliance with these Policies and Procedures." (*Id.* at § 8.4.)

During an investigation, Synergy's distributorship agreement requires Synergy to "communicate with the Team Members involved and, if required, issue an investigation letter formally notifying the Team Member of an investigation." (*Id.*) Additionally, "[t]he Team Member will be notified in such a letter the terms of the investigation, including but not limited

to the period of time with which a Team Member has to respond to the details of the

investigation and impending disciplinary action." (*Id.*)

       With respect to termination, Synergy's distributorship agreement states:

> If necessary, a Team Member may be terminated by Synergy. Synergy has the right to take quick and decisive action in limiting or terminating a Team Membership that is found in violation of the Policies and Procedures, the Membership Application, rules governing the Compensation Plan, or any state or federal laws, statutes, and/or regulations that pertain to the business of Synergy.

(*Id.* at § 8.5.)  Moreover, a Team Member may appeal Synergy's termination decision.  (*Id.*)  If

an appeal is filed, Synergy's distributorship agreement requires Synergy to review the appeal and

"notify the Team Member of [its] decision."  (*Id.*)

       Relevant to V3's claims, Synergy's distributorship agreement allows Synergy to

terminate a team member if a team member is engaged in litigation with Synergy.  Specifically,

Synergy's distributorship agreement states:

> If there exists litigation, or other significant dispute, in which the interests of a Team Member are adverse to the interests of Synergy, Synergy may, upon written notice to the Team Member, terminate or suspend the Membership of such Team Member if Synergy, in its sole discretion, determines that such termination or suspension is desirable to protect its business interests, including, without limitation, the protection of Synergy's proprietary information.

(*Id.* at § 8.7.)

       In 2015, Synergy and HealthBanc were involved in a dispute involving royalty payments.

(Dkt. No. 7, ¶ 13.)  V3 alleges that on November 10, 2015, Synergy threatened to end V3's

distributorship if HealthBanc did not accept Synergy's terms to end the dispute.  (*Id.* at ¶ 15.)

On February 19, 2016, HealthBanc filed a lawsuit against Synergy in the Utah federal district

court.  (*Id*. at ¶ 17, Case No. 2:16-cv-00135-JNP.)

       In February 2016, V3 sent a "distributor transfer request" to Synergy alerting Synergy

that V3 had an interested buyer in V3's distributorship.  (Dkt. No. 16, ¶ 15.)  On March 1, 2016,

Synergy sent a letter via email informing V3 of Synergy's decision to terminate V3's

distributorship.  (*Id.* at ¶ 16.)  Synergy informed V3 it was terminating V3's distributorship

because of V3's failure to comply with Synergy's Code of Ethics.  Specifically, Synergy's letter

stated:

> We have become aware that you have violated the Synergy WorldWide Policies
> and Procedures (P&P), specifically the Synergy Code of Ethics. We have
> conducted an investigation and determined that these allegations against you are
> true . . .  Due to your failure to comply with the requirements of the Synergy Code
> of Ethics as well your conduct that is detrimental to Synergy's reputation and
> business, you are hereby notified that pursuant to sections 4.1, 8.5, and 8.7 of the
> Synergy Worldwide Policies & Procedures, your Team Membership is
> terminated, effective immediately.

(Dkt. No. 8-2.)

On April 21, 2016, V3 filed the above captioned lawsuit against Synergy.  (Dkt. No. 2.)

Subsequently, V3 amended its complaint twice in response to Synergy's motions to dismiss. (*See*

Dkt. Nos. 10, 12, 14, and 16.)   V3's Second Amended Complaint asserts several causes of

action, including: breach of contract, violations of the Utah Consumer Sales Practices Act,

breach of the covenant of good faith and fair dealing, unjust enrichment, and fraudulent

inducement.  (Dkt. No. 16.)

## DISCUSSION

### I. V3's Motion for a Preliminary Injunction

V3 asks the Court to enjoin Synergy from: (1) removing V3 from Synergy's website; (2)

confiscating or terminating V3's downlines; (3) terminating V3's commission payments; and (4)

interfering with V3's attempt to transfer its distributorship to another party.  (Dkt. No. 7, ¶¶ 1-4.)

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, the Court may issue a

preliminary injunction if the Court finds:

4

> (1) [a] substantial likelihood that the movant will eventually prevail on the merits; (2) a showing that the movant will suffer irreparable injury unless the injunction issues; (3) proof that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) a showing that the injunction, if issued, would not be adverse to the public interest.

*Hartford House, Ltd. v. Hallmark Cards, Inc.*, 846 F.2d 1268, 1270 (10th Cir. 1988) (internal quotation marks and citations omitted).  The moving party has the "burden to establish that each of these factors tips in his or her favor."  *Heidman v. South Salt Lake City*, 348 F.3d 1182, 1188–89 (10th Cir. 2003).  Importantly, "[a] preliminary injunction is an extraordinary remedy, the exception rather than the rule."  *U.S. ex rel. Citizen Band Potawatomi Indian Tribe of Oklahoma v. Enter. Mgmt. Consultants, Inc.*, 883 F.2d 886, 888 (10th Cir. 1989)

V3 has failed to demonstrate its alleged economic loss constitutes irreparable harm. Therefore, V3 is not entitled to injunctive relief.  "'To constitute irreparable harm, an injury must be certain, great, actual and not theoretical.'"  *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1267 (10th Cir. 2005) (citations omitted). "'[T]he party seeking injunctive relief must show that the injury complained of is of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm.'"  *Heideman*, 348 F.3d at 1189 (emphasis in original) (citations omitted).  Importantly, the Tenth Circuit has noted, a "'showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction, the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered.'"  *Dominion Video Satellite, Inc.*, 356 F.3d at 1260, 1261 (10th Cir. 2004) (quoting *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990)).  Moreover, it is "well settled that simple economic loss usually does not, in and of itself, constitute irreparable harm . . . ."  *Heideman*, 348 F.3d at 1189.

For example in *Arnett v. Howard*, a filmmaker asked for a temporary restraining order and preliminary injunction to prevent an author from "selling, distributing, or exhibiting the film, audio book, or television commercial" until his lawsuit against the author had been resolved. *Arnett v. Howard*, 2:13-cv-591, 2014 WL 3533996, at *6 (D. Utah Mar. 21, 2014).  This Court denied the filmmaker's request for a preliminary injunction, holding: "[p]laintiff seeks only monetary damages and does not allege a harm that cannot be compensated after trial by monetary damages." *Id.* at *7.

Similarly, in *Pork City Properties v. Union Pacific Railroad Company*, 5188 F.3d 1186, 1187 (10th Cir. 2008), the plaintiff brought suit against Union Pacific Railroad for ceasing a rail service to the plaintiff's commercial warehouse.  The plaintiff sought a preliminary injunction enjoining Union Pacific Railroad from "ceasing rail operations servicing his warehouse and from informing others that [the plaintiff] could not receive shipments by rail."  *Id.* at 1187.  The district court denied the plaintiff's motion for preliminary injunction and the Tenth Circuit affirmed.  *Id.* at 1187, 1190.  The Tenth Circuit agreed with the district court that the plaintiff's loss of business could "be compensated in money damages" and, therefore, the plaintiff had failed to demonstrate irreparable harm.  *Id.* at 1190.

Just like *Arnett* and *Pork City Properties*, V3's loss of business can be compensated in money damages.  V3's contractual, statutory, and equitable claims against Synergy all surround damages V3 allegedly suffered as the result of losing its distributorship agreement with Synergy. (Dkt. No. 16, p. 12–13.)  At this juncture, the Court is satisfied that any harm suffered by V3 can be compensated with monetary damages.  Accordingly, V3 has failed to carry its burden to show it is entitled to injunctive relief.  V3's Motion for a Preliminary Injunction is denied.

**II. Synergy's Motion to Dismiss**

V3 alleges that Synergy's conduct entitles V3 to damages under several theories, including: breach of contract, violations of the Utah Consumer Sales Practices Act, breach of the covenant of good faith and fair dealing, unjust enrichment, and fraudulent inducement.  (Dkt. No. 16.)  Synergy argues that the Second Amended Complaint should be dismissed in its entirety pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

In deciding a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court presumes the truth of all well-pleaded facts in the complaint, but need not consider conclusory allegations.  *Tal v. Hogan*, 453 F.3d 1244, 1252 (10th Cir. 2006), *cert. denied*, 549 U.S. 1209 (2007).  The Court is not bound by a complaint's legal conclusions, deductions, and opinions couched as facts.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 565 (2007).  Furthermore, though all reasonable inferences must be drawn in the non-moving party's favor, a complaint will only survive a motion to dismiss if it contains "enough facts to state a claim to relief that is plausible on its face."  *Id.* at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

For the reasons that follow, the Court finds that V3 has pled a plausible claim for relief under a theory of breach of contract and breach of the covenant of good faith and fair dealing. However, the Court finds that V3's unjust enrichment claim, Utah Consumer Sales Practices Act claim, and fraudulent inducement claim fail to state a claim upon which relief can be granted.

**A. Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing**

Synergy argues that because Synergy's distributorship agreement lacked a finite duration, V3's distributorship was terminable at-will. (Dkt. No. 18, p. 13.)  Therefore, Synergy claims,

V3's breach of contract claim and good faith and fair dealing claim fail as a matter of law. (*Id.*) The Court disagrees.

"'The elements of a prima facie case for breach of contract are (1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages.'" *Am. W. Bank Members, L.C. v. State*, 2014 UT 49, ¶ 15, 342 P.3d 224 (quoting *Bair v. Axiom Design, L.L.C.*, 2001 UT 20, ¶ 14, 20 P.3d 388). An enforceable contract requires an offer and acceptance supported by consideration. *See Cea v. Hoffman*, 2012 UT App 101, ¶ 24, 276 P.3d 1178. Moreover, "[a]n implied covenant of good faith and fair dealing inheres in every contract." *Eggett v. Wasatch Energy Corp.*, 2004 UT 28, ¶ 14, 94 P.3d 193, 197 (citations omitted). "Under the covenant of good faith and fair dealing, both parties to a contract impliedly promise not to intentionally do anything to injure the other party's right to receive the benefits of the contract." *Id.* "A violation of the covenant [of good faith and fair dealing] gives rise to a claim for breach of contract." *See St. Benedict's Dev. Co. v. St. Benedict's Hosp.*, 811 P.2d 194, 200 (Utah 1991) (citations omitted).

Regardless of the at-will or for cause nature of the Synergy distributorship agreement, V3's theory of contractual breach is straightforward. Synergy's termination letter notified V3 it was terminating V3 for cause for violating Synergy's Code of Ethics. V3 claims that in order for Synergy to terminate V3 for cause, Synergy's distributorship agreement provided V3 with certain rights to defend itself against termination. (Dkt. No. 16, ¶¶ 41–44.) Furthermore, V3 alleges that Synergy denied V3 the opportunity to rebut its termination by summarily terminating V3's Synergy distributorship. (*Id.*) Accordingly, the Court is satisfied that V3 has alleged a plausible breach of contract claim and a plausible breach of the covenant of good faith and fair dealing.

In the alternative, even if the Court were to consider the Synergy distributorship agreement terminable at-will—allowing Synergy to terminate V3 without justification—the Court's holding is the same.  Generally, under Utah law a contract for an indefinite period may be terminated at-will.  *See Glacier Land Co. v. Claudia Klawe & Assoc., L.L.C.*, 2006 UT App 516, ¶ 16, 154 P.3d 852, 860 ("Utah's employment law presumes that all employment relationships entered into for an indefinite period of time are at-will . . . ." (citations omitted)).  However, some courts have recognized in contexts similar to an at-will distributor relationship that a terminated party must be given a reasonable time to recoup its investment.  *See, e.g.*, *Lund v. Arbonne Int'l, Inc.*, 887 P.2d 817, 820 (Or. Ct. App. 1994) ("[T]the rule in Oregon is that a contract for an indefinite period may be terminated at will when reasonable notice is given." (citations omitted)); *Famous Brands, Inc. v. David Sherman Corp.*, 814 F.2d 517, 521 (8th Cir. 1987) ("[A]t the very least, [plaintiff] would be entitled to rely on the supply agreement . . . for a reasonable time so as to recoup its investment in the promotion and sale of the [defendant's] product.").  "The doctrine of recoupment is designed to remedy the inequity which arises when a manufacturer, after having required a distributor to make a sizeable investment in the furtherance of a distributorship, terminates the working relationship without just cause, leaving the distributor with substantial unrecovered expenditures."  *W.K.T. Distrib. Co. v. Sharp Elecs. Corp.*, 746 F.2d 1333, 1336 (8th Cir. 1984) (quoting *Ag-Chem Equip. Co., Inc. v. Hahn, Inc.*, 480 F.2d 482, 487 (8th Cir. 1973)).

With this backdrop in mind, even if the Court were to conclude that Synergy's distributorship agreement is terminable at-will, the Court cannot say V3 has failed to plead a plausible claim for relief.  Rather, V3 alleges that it spent years investing in its Synergy distributorship and that it was not given a reasonable opportunity to sell its distributorship to a

ready and willing third party buyer. Accordingly, V3's breach of contract claim and breach of

the covenant of good faith and fair dealing claim are sufficiently pled and survive Synergy's

Motion to Dismiss.

### B. Unjust Enrichment

V3 argues that Synergy was unjustly enriched because "V3 has developed and

maintained the downline" and it would be "unequitable for Synergy to take that away from V3

but still retain the sales that result from it." (Dkt. No. 16, ¶ 63.) Synergy counters that V3's

unjust enrichment claim should be dismissed because the parties' dispute is governed by the

Synergy distributorship agreement. (Dkt. No. 18, p. 11.)

Synergy's distributorship agreement governs the dispute between the parties. Therefore,

V3 cannot maintain a claim for unjust enrichment. Absent an enforceable contract, a plaintiff

may recover under the equitable doctrine of unjust enrichment. *Jeffs v. Stubbs*, 970 P.2d 1234,

1245 (Utah 1996) ("Unjust enrichment law developed to remedy injustice when other areas of

the law could not."). To establish a claim of unjust enrichment, a plaintiff must establish:

> '(1) a benefit conferred on one person by another; (2) an appreciation or
> knowledge by the conferee of the benefit; and (3) the acceptance or retention by
> the conferee of the benefit under such circumstances as to make it inequitable for
> the conferee to retain the benefit without payment of its value.'

*Espinoza v. Gold Cross Servs., Inc.*, 2010 UT App 151, ¶ 10, 234 P.3d 156 (citations omitted).

Importantly, however, "a claim of unjust enrichment cannot arise where there is an express

contract governing the 'subject matter' of a dispute." *U.S. Fid. v. U.S. Sports Specialty*, 2012 UT

3, ¶ 11, 270 P.3d 464, 468 (citing *Selvig v. Blockbuster Enters., LC*, 2011 UT 39, ¶ 30, 266 P.3d

691).

Synergy's distributorship agreement governs V3's remedies, if any, against Synergy. As

noted above, V3's contractual claims assert that Synergy has failed to abide by the terms of its

distributorship agreement and deprived V3 the benefit of its bargain.  Where there is an express

contract governing the parties' dispute, recovery for unjust enrichment is unavailable.

Accordingly, V3's claim of unjust enrichment fails a matter of law.

### C. Utah Consumer Sales Practices Act

V3 claims that Synergy violated the Utah Consumer Sales Protection Act ("UCSPA") by

representing that "a member would receive residual income by becoming a member" that would

last in perpetuity.  (*See* Dkt. No. 16, ¶¶ 8–11, 34.)   Synergy argues that V3's UCSPA claim fails

because V3 has failed to allege that Synergy promised its distributors a guaranteed income

stream.  (Dkt. No. 18, p. 5–6.)

A defendant violates UCSPA by "knowingly or intentionally . . . indicat[ing] that the

subject of a consumer transaction has sponsorship, approval, performance characteristics,

accessories, uses, or benefits, if it has not."  Utah Code Ann. § 13-11-3(2)(a).  Here, despite the

Synergy representations cited by V3, V3 has failed to allege a plausible claim under the UCSPA.

Synergy's distributorship agreement states that "[a] Team Member is neither guaranteed a

specific income nor assured any level of sales, profit, or success."  (Dkt. No. 7-1, § 7.1.)

Moreover, if a distributor is terminated involuntarily, Synergy's distributorship agreement states:

"The terminated Team Member shall lose all rights to the existing downline and shall no longer

be entitled to receive Bonuses, awards, or any compensation whatsoever from Synergy . . . ."

(*Id.* at § 8.6.)  Therefore, V3 has failed to plausibly allege Synergy promised V3 indefinite

guaranteed income.  V3's UCSPA claim is dismissed.

### D. Fraudulent Inducement

V3 alleges that Synergy engaged in fraudulent inducement by asserting that new team

members would "receive lifelong or long-term residual income that is transferable by will" when

in fact Synergy reserves the right to terminate a distributorship "at any time for any or no reason." (Dkt. No. 16, ¶¶ 67–69.) Synergy argues that V3's fraudulent inducement claim fails to plead fraud with particularity as required by Rule 9 of the Federal Rules of Civil Procedure. (Dkt. No. 18, p. 23.) Additionally, Synergy claims V3 has not alleged it was induced by Synergy or that V3 relied on any alleged false statements made by Synergy when purchasing its Synergy distributorship form a third party. (*Id.* at 24.)

> To prevail on a claim of fraudulent inducement, V3 must demonstrate:
>
> (1) that a representation was made (2) concerning a presently existing material fact (3) which was false and (4) which the representor either (a) knew to be false or (b) made recklessly, knowing that there was insufficient knowledge upon which to base such a representation, (5) for the purpose of inducing the other party to act upon it and (6) that the other party, acting reasonably and in ignorance of its falsity, (7) did in fact rely upon it (8) and was thereby induced to act (9) to that party's injury and damage.

*Daines v. Vincent*, 2008 UT 51, ¶ 38, 190 P.3d 1269, 1279. Additionally, for a claim of fraud to proceed, a plaintiff must satisfy the heightened pleading standards of Rule 9(b). *United States ex rel Barrick v. Parker-Migliorini Int'l, LLC*, No. 2:12-CV-00381-DB, 2016 WL 3029933, at *4 (D. Utah May 25, 2016). Rule 9(b) demands that when "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9.

V3 has not alleged a plausible claim for relief under a theory of fraudulent inducement. There are no facts before the Court that demonstrate that Synergy had any involvement in V3's purchase of a Synergy distributorship from a third party. (Dkt. No. 16.) Additionally, the false statements attributable to Synergy alleged by V3 in the Second Amended Complaint occurred from 2012 to 2016. (*Id.* at ¶¶ 9–11.) However, V3 purchased its Synergy distributorship in 2011. (*Id.* at ¶ 12.) Accordingly, there are no facts to support V3's claim of fraudulent inducement. V3's fraudulent inducement claim is dismissed.

## CONCLUSION

V3's Motion for a Preliminary Injunction (Dkt. No. 7) is DENIED.  Synergy's Motion to

Dismiss (Dkt. No. 18) is GRANTED IN PART and DENIED IN PART.  V3's unjust enrichment

claim, Utah Consumer Sales Protection Act claim, and fraudulent inducement claim are

dismissed.

Dated: September 29, 2016.

BY THE COURT:

Dee Benson
United States District Judge